EDWARD S. STOKES, Respondent, *v.* JOHN W. MACKAY et al., Appellants.

(Argued March 7, 1893; re-argument ordered October 17, 1893; re-argued December 4, 1893; decided December 19, 1893.)

APPEAL from judgment of the General Term of the Supreme Court in the first judicial department, entered upon an order made June 8, 1892, which affirmed a judgment in favor of plaintiff entered upon a verdict directed by the court and affirmed an order denying a motion for a new trial.

This action was brought to recover the sum of $100,000, less a payment thereon of $25,000, with interest from the 26th day of February, 1889.

The plaintiff alleges in his complaint that prior to the 26th day of December, 1888, he owned and possessed certain bonds and stocks of telegraph companies, for convenience called telegraph properties, and that at that time an agreement was entered into between him and the defendants, whereby they agreed to purchase the telegraph properties and pay therefor the sum of $100,000, upon the assignment and delivery to them by him of such properties; that he thereafter assigned and transferred the properties to them and performed the agreement on his part; that thereafter, on or about the 25th day of February, 1889, they paid him the sum of $25,000 as a partial payment, and that the balance, $75,000, remained due to him, and he prayed judgment for that sum, with interest. The defendants answered separately, denying the allegations of the complaint, and making certain other allegations against the plaintiff's right to recover. The issues thus joined were brought to trial at a Circuit Court, and, after the evidence on both sides had been given, the trial judge refused, upon the application of the defendants, to submit any questions of fact to the jury, and directed a verdict in favor of the plaintiff.

The following are the opinions in full:

" This case has been argued and re-argued by very able counsel. We have given it the thorough examination which its importance demands, and we have reached the conclusion

that the learned trial judge erred in refusing to submit the questions of fact to the jury.

"It appears that for some years prior to December, 1888, the defendant Mackay was quite largely interested in telegraph property, and in or about the year 1884 the plaintiff, in a conversation with him, offered to purchase for him certain other telegraph properties for the purpose of improving and benefiting that which he, Mackay, already owned, the purchases to be made with money furnished by Mackay. Thereafter Mackay advanced for the purchase of such properties from time to time during several years after 1884, in all upwards of $1,000,000. There was no agreement in writing between Stokes and Mackay explaining their relations, and in December, 1888, Mackay did not even have vouchers to show how much money he had advanced to Stokes, and down to that time he had had no account from Stokes of the manner in which he had disbursed the money with which he had been intrusted by Mackay. Stokes had taken and he held in his own name most of the properties thus purchased, although it is quite clear from the evidence that all of them were to have been turned over to Mr. Platt, Mackay's agent in the city of New York. The evidence tends quite strongly to show that Mackay was to have the title to all the properties purchased with his money, but it is a disputed question of fact whether he was to have them as absolute owner or simply as collateral security for the moneys advanced. According to the claim of Stokes, as put forward in his evidence, the only interest he was to have was one-half of the profits of all the properties acquired by and through him after Mackay had been fully reimbursed for all his advances.

"Prior to July 28th, 1885, Mackay had loaned to C. H. Read & Co., a firm to which Stokes belonged and who were the proprietors of the Hoffman House in the city of New York, from time to time, in all the sum of $370,352.50, for which on that day he took their note payable on demand. The interest on that note was adjusted in the fall of 1888, and upon a settlement between Stokes and Mackay, the payment of the whole interest to January 1st, 1889, was indorsed upon the note, the principal of the note remaining unpaid. In

December, 1888, Mackay, through his agents, from time to time requested Stokes to turn over to his agent, Mr. Platt, the telegraph properties held by him, and Stokes complied with those requests only to a limited extent. Mackay at that time was in California, where he resided. Prior to about the 24th day of December, 1888, there had never been any negotiations on the part of Mackay for the purchase of the telegraph properties from Stokes. His uniform claim and demand had been that he was entitled to have them turned over to his agent. Shortly prior. to the 24th of December, Stokes declined to turn over any more of the telegraph properties unless some agreement was made with him, showing his interest in them, and the share of profits in them to which he was entitled. Finally on the 24th day of December, he caused an agreement to be drawn up by Col. Ingersoll, his attorney, as follows :

" ' This agreement made this        day of        , 1888, between Edward S. Stokes, of the City and State of New York, party of the first part, and John W. Mackay, of San Francisco, California, and Hector de Castro, of the City and State of New York, parties of the second part, witnesseth :

" ' That whereas, the party of the first part, is the owner of certain bonds and stock of the telegraph company known as The United Lines Telegraph Company, and also of The Michigan Postal Telegraph Company, and certain stock in The Chicago Board of Trade Telegraph Company, and The Pacific Telegraph Company, and The Pacific Mutual Telegraph Company, also of stock in The Lehigh Valley Telegraph Company, and also the owner of certain contracts made between himself and E. L. Martin for the purchase of additional stock in The Pacific and The Pacific Mutual Telegraph Companies, which contracts and the liability under them, the parties of the second part hereby agree to assume; and

" ' Whereas, the party of the first part has unsettled accounts with the parties of the second part for large sums of money borrowed at various times ; and

" ' Whereas, the parties of the second part wish to buy, and the party of the first part wishes to sell the said telegraph

property and the said securities, including all equities in contracts, as well as all judgments and liens of every kind and description appertaining thereto, and to settle and adjust the indebtedness referred to ; and

" ' Whereas, the parties of the second part are willing to assume the prosecution and defense of any suits now pending in relation to said property, and to prosecute and defend the same, paying the costs thereof ; and

" ' Whereas, the party of the first part has agreed that in the prosecution and defense of such suits he will furnish any and all testimony that he may have, and will at all times furnish the facts in relation thereto ; and

" ' Whereas, the party of the first part is indebted for legal services performed in and about said business, and has signed certain bonds and certain contracts to idemnify others, the parties of the second part hereby agree to pay and discharge said indebtedness, as well as to keep the party of the first part harmless by reason of the signing of said bonds and contracts ; and

" ' Whereas, it is the intention of both parties that the said party of the first part shall be relieved from all the indebtedness and responsibility referred to in this agreement, from and after the date hereof, and that the parties of the second part shall be relieved from all responsibility of every kind and nature by reason of any transaction or transactions before this date.

" ' Now, therefore, it is agreed, by and between the parties, as follows :

" ' *First.* The party of the first part shall furnish all testimony, and shall make, execute and deliver all papers that may be necessary in the prosecution or defense of any suits now pending, or that may hereafter be brought, without charge.

" ' *Second.* The said party of the first part hereby agrees to turn over to the parties of the second all the bonds and stock to which he may be entitled, of The United Lines Telegraph Company, and that he will assign all judgments that he may own, or in which he may be interested, that have been recovered against The United Lines Telegraph Company, or

The Bankers' and Merchants' Telegraph Company, or that in any event may be a lien upon the property of The United Lines Telegraph Company, and that the same shall be assigned and delivered in due form free of all charge and expense to the parties of the second part.

"' *Third.* It is further agreed that the said party of the first part will so assign all of the property before mentioned, and all of his rights, interests and equities therein, for and in consideration of the cancellation of the indebtedness referred to, and upon the payment of the sum of one hundred thousand dollars, upon the delivery of the bonds and securities referred to in the annexed schedules.

"' It is agreed on the part of the parties of the second part, that the receipt of the said property and interests herein referred to, shall be in full satisfaction of all claims and demands, of whatever kind· and nature, against the said Stokes, and also against the firm of C. H. Reed & Company, and that the said parties of the second part will save and keep harmless the said parties from any further costs or liability growing out of the transactions connected with the said telegraph business.

"' There is attached hereto a schedule marked ' A,' the same being a list of all the properties ; also a schedule marked ' B,' the same being a list of suits now pending ; also a schedule marked ' C,' the same being a list of the judgments.

"' In witness whereof, we have hereunto set our hands and seals this          day of           , 188 .'

"On the 24th day of December Stokes had and presented this agreement at a meeting between himself, De Castro, Ingersoll and Platt. De Castro had been in the employ of Mackay, and had been the intermediary between Stokes and Mackay in the negotiations in reference to the telegraph properties, it having been deemed desirable by both of them that Mackay should not be known in Stokes' transactions in reference to the properties. It was because De Castro had acted as such intermediary that Stokes required that his name should be signed to the contract as one of the parties of the second

part. Mackay knew nothing whatever about the terms of the proposed agreement, and nothing contained in the agreement had ever been brought to his attention. The debt which he held against the firm of C. H. Read & Co. had no connection with, or relation to, the telegraph business or the telegraph properties. Neither of the persons who were present at the time this agreement was signed by Stokes and De Castro had any agency whatever in reference thereto for Mackay. There is no evidence whatever that anybody was authorized to enter into such an agreement for Mackay, or to negotiate for the purchase of the telegraph properties for him, or that Mackay ever contemplated their purchase. But the evidence tends to show that he always understood and claimed that the properties belonged to him. On the 24th day of December the arrangement was made between Stokes, De Castro and Ingersoll that Stokes should deliver certain telegraph bonds into the hands of Ingersoll, to be held by him as custodian until the agreement was approved or signed by Mackay, when they were to be turned over to Platt as Mackey's agent; but that if Mackay did not approve of or sign the contract then it was to be null and void, and the bonds were to be returned to Stokes. At that time Ingersoll gave his receipt for $935,000, par value of the telegraph bonds. This proposed contract was executed in duplicate by Stokes and De Castro. Stokes kept one copy, and it was understood and arranged between Ingersoll and Stokes that the other copy should be sent by Ingersoll to Mackay in California, for his signature. At that interview between De Castro, Ingersoll and Stokes two telegrams were prepared which were to be sent to Mackay, and on that day one was sent by Mr. Platt as follows:

" 'I did not succeed in meeting Stokes until late to-day, when made demand for U. L. T. Co. Bds. Ingersoll was present, and said that, owing to legal complications, he thinks it would be better not to deliver U. L. T. Co. Bds. to me for the present, and Ingersoll requests me to telegraph you that Stokes has deposited with him to-day 900,000, 30,000, 5,000 1st Mtge. U. L. T. Co. Bds. 1,000,000, 600,000 stock will be assigned, and all judgments turned over on your order as soon as agreement forwarded to-day is signed by you. He said this course

had to be pursued to avoid trouble in the courts, and he says this gives you entire control of the property.

" 'E. C. PLATT.'

"And another one by De Castro as follows:

" ' E. S. Stokes turned over to Col. R. G. Ingersoll nine hundred and thirty-five thousand of bonds and other securities. He signed also an agreement which is forwarded to you and which leaves him out. Col. R. G. Ingersoll will turn over to E. C. Platt these securities for custody; this is the only way it could be done, and I hope it will be satisfactory. E. S. Stokes swears that he told you about having to use some of the bonds to raise money which he needed absolutely to avoid bankruptcy. Please accept my best wishes for happy Xmas.

" 'H. DE CASTRO.'

" To these telegrams Mackay replied to De Castro as follows:

" 'All right and satisfactory. I want you to tell to Ingersoll to do nothing in this case except what he knows to be correct and legal, as I do not want trouble for what has been done in the past, nor in the future.'

"And then to Platt as follows:

" ' Telegram received. All right. You take whatever securities Ingersoll gives you, as Ingersoll understands this matter fully. I do not wish him to do anything but what is legal.'

" On the 26th day of December, Ingersoll wrote the following letter to Mackay, inclosing the contract:

" 'NEW YORK, *Dec.* 26, 1888.

" ' JOHN W. MACKAY, Esq. :

" ' *My Dear Friend* — I regret that there was any feeling on your part about the United Lines securities. I wanted to carry out your views, so did Mr. Stokes, but it was impossible to do so. These bonds have been issued for about three years, and Mr. Stokes has sworn again and again that they belonged to him, and I understood and understand the fact so to be. Suits had been commenced to enjoin Mr. Stokes from selling or disposing of these bonds, and these suits were defeated by the fact that he had not disposed of them and did not intend to. This applied to three hundred of them. If they had been turned over or sold, the suits would have gone against us.

" ' Under these circumstances the bonds could not be turned over in the way suggested by you. They could be sold, and this action would be consistent with all the testimony given by Mr. Stokes.

" ' Nine hundred and thirty-five of the bonds have been delivered to me and one million six hundred thousand stock.

" ' Orders will be given me on Farmers' Loan & Trust Company for all stock held by that Co. In other words, all the securities will be handed to me.

" ' It seems to me, taking into consideration the complications of the matters between you and Mr. Stokes and the condition of the business, that everything should be settled. There is some danger that it may be claimed that you were a partner and are so still in all this business, including the hotel, and consequently I thought it advisable to include everything, and I think this will meet your approval.

" ' You know that some bonds were used as collateral. Thirty-five thousand dollars was borrowed at the Western National. I gave the note and Mr. Stokes indorsed and deposited the collateral. At that time the money had to be raised or the effect would have been disastrous. If Stokes had then failed the property would have been attached from every side & the arrangement with the Western Union would have failed. I thought then, and still think, that it was the thing to do. I believe that you have been informed as to the rest.

" ' The consideration mentioned will clear everything, take all the bonds up and put the entire property into your hands.

" ' In foreclosing the deed of trust I think that de Castro had better take charge of that.

" ' I suppose that de Castro has written you on this whole business. I inclose the contract. If it meets your approval please sign & return and I will send you duplicate.

" ' I am going to Washington to-night to arrange with the Atty. Gen. and the counsel of Western Union & Union Pacific to argue the application for injunction to prevent Union Pacific from carrying out the recent act of Congress in regard to taking messages for all telegraph companies.

" ' Yours truly,
" ' R. G. INGERSOLL.'

" This letter was written and mailed the latter part of the day it is dated, and the telegrams to De Castro and Platt had been previously received on the morning of that day, and their contents were known to Ingersoll, Stokes, De Castro and Platt, who were engaged in these transactions. Notwithstanding the receipt of these telegrams, it is worthy of notice that Ingersoll in his letter stated : ' I inclose the contract. If it meets your approval please sign and return and I will send you duplicate,' from which it is quite apparent that Ingersoll, who had been made the custodian of the securities to be turned over, did not understand, at the time he wrote that letter, that Mackay by his telegrams had approved the contract. Mackay received the letter inclosing the contract on or about January 3d, 1889, and immediately wrote Col. Ingersoll as follows :

" ' SAN FRANCISCO, *Jany.* 3, 1889.

" ' Col. R. G. INGERSOLL :

" ' *My Dear Col.* — Your letter and Article of Agreement dated the 26th received.

" ' On looking over the agreement I see no necessity for signing it. Some portions of it are wrong. ' You say it releases C. H. Read & Co. from all claims.' The claim I hold against C. H. Read & Co. has nothing whatever to do with the Telegraph business. There is no necessity to make any change at present except to place •the securities with Mr. Platt for safe keeping, &c. You know exactly what is to be done and I want nothing done except through your instructions.

" ' Very sincerely,

" ' JOHN W. MACKAY.'

"And on the next day he telegraphed De Castro as follows : ' I have received your letter. That agreement will not suit me. I will sign a proper one when I come east and the thing is cleaned up.'

" The facts so far stated are not much in dispute, and if there were nothing else in the record the case would have to turn upon this evidence and the inferences to be drawn therefrom.

" It is claimed on the part of the plaintiff that Mackay became bound by the telegrams which he sent to Platt and De Castro,

and that as matter of law he must be held to have adopted the contract by those telegrams. It is quite true that without knowing anything that was done by Ingersoll and De Castro in the city of New York he could have used language strong enough in those telegrams to have made himself a party to the contract just as it was written. (*Fitzmaurice* v. *Bagley*, 6 Ell. & Bl. 868 ; *Lewis* v. *Read*, 13 M. & W. 834; *Rogers* v. *Kneeland*, 10 Wend. 218.) But did he intend to? We think, in view of all the circumstances, that the meaning to be given to the language used in those telegrams, and the inferences to be drawn from them, were matters to be submitted to the jury. (*White* v. *Hoyt*, 73 N. Y. 505 ; *First Natl. Bank* v. *Dana*, 79 id. 108 ; *Kenyon* v. *R. S. & M. A. Assn.*, 122 id. 247.) It certainly cannot be inferred as matter of law that, without knowing anything about the provisions of the contract Mackay intended to purchase telegraph properties which he had always claimed as his own, and not only pay $100,000 therefor in cash, but surrender to Stokes a note for upwards of $370,000 against his firm, and in addition thereto release him from any accounting for over $1,000,000, which had from time to time been advanced to him. Mackay had, through his agents, been claiming these properties and demanding that they should be turned over, and no one in the city of New York was authorized to purchase them upon any terms for him. He had no reason to suppose that an agreement had been signed by him, or in his behalf, releasing Stokes from the note which had no connection whatever with the telegraph properties, and when he telegraphed back ' all right and satisfactory,' what did he mean ? We think it was for the jury under all the circumstances to infer what he meant and how he was understood. It is certainly not an unreasonable inference to suppose, in view of all the facts surrounding the transactions, that he meant it was all right and satisfactory that the bonds had been turned over to Ingersoll, and that the stocks and judgments, the fruits of the money he had advanced to Stokes, would also be turned over. Without giving our views at greater length, and without calling minute attention to all

the evidence we are very clear that there was nothing in the two telegrams sent by Mackay on the 24th of December, from which it could be said as matter of law that he became a party to the contract which had previously been signed by Stokes and De Castro. Mackay was not bound to direct Ingersoll to return the securities placed in his hands by Stokes. Ingersoll did not hold them as Mackay's agent, but as custodian for Stokes. When Mackay refused to approve or sign the contract, Stokes, as between him and Ingersoll, was entitled to receive the securities again. Mackay could continue to demand the telegraph properties from Stokes as he had done before December 24th and even from Ingersoll, without making himself a party to the agreement. He claimed the properties as matter of right before December 24th, and he could continue to claim them in the same way without adopting the agreement. None of the properties passed from Ingersoll into the hands of Mackay and thus out of the reach of Stokes until they were turned over in March, 1889, under an alleged agreement then made. There certainly was no conclusive evidence that Mackay so dealt with the telegraph properties or that he so acted or omitted to act in reference to them as to make the contract of December 24th binding upon him.

"But when we proceed further it is made much plainer that there were questions of fact to be submitted to the jury. There was evidence of subsequent events which illuminate what went before.

"There was evidence tending to show that the contents of the letter of Mackay to Ingersoll dated January 3d, and his telegram to De Castro of January 4th were communicated to Stokes; that Stokes knew then that Mackay declined to approve or sign the contract; that Mackay never at any time claimed any rights under the contract; that thereafter, down to the 20th day of March, 1889, through his agents and in person, he claimed these telegraph properties as matter of right and not under the contract; that Stokes at no time in his interviews with Mackay and his agents claimed that Mackay was bound by the contract; that all the negotiations

between Mackay and his agents on one side and Stokes on the other proceeded on the theory that the contract had not been signed or become binding; that nothing was done by Stokes in pursuance of or in reliance upon the contract, or in performance thereof; that finally, on the 20th day of March, 1889, after some negotiations between Stokes and Mackay and his agents, an arrangement was made by which Stokes agreed to turn over to Mackay all the telegraph properties without any agreement as to compensation, relying entirely upon Mackay's generosity for his compensation for his supposed interest in the properties, and that in pursuance of that arrangement he did turn over from time to time upon the demand of Mackay's agents these properties, never in any of the interviews with them claiming that he was doing it under the contract or that Mackay was in any way bound by the contract until shortly before the commencement of this action in June, 1890. There is also evidence by several witnesses of the defendants plainly contradicting nearly all the material evidence given by Stokes as a witness in his own behalf.

" Under such circumstances it is impossible for us to perceive how it can properly be held that there were no questions of fact for the determination of the jury, and that Mackay, as matter of law, was bound by the contract of December 24th, by the ratification and adoption thereof. We do not mean to intimate any opinion as to the weight of the evidence on either side, or as to the merits of the controversy between these parties. The credibility of both Stokes and Mackay, as witnesses, was matter for the consideration of the jury as well as the force and effect of all the evidence. The ultimate issue to be determined is whether Mackay became bound as a party to the agreement signed by Stokes and De Castro by ratification, adoption or estoppel, and all the evidence bearing upon that issue should be fairly submitted to the jury for their determination.

" We have intended only to call attention to some of the main features of the case. Time and space forbid that we should qualify and limit some of our statements as the evidence may possibly render proper. For the present purpose that is

not needed. Stokes seeking to bind Mackay by a contract involving enormous amounts, and to bind De Castro by a contract in which he has no interest whatever, should make a case by a preponderance of evidence clear and satisfactory.

" We have not overlooked the fact that during several years Stokes rendered valuable and efficient services in purchasing, defending and managing the telegraph properties, and while his compensation for such services is not directly involved in this action, it is an incidental feature of the case not lightly to be ignored.

" Our conclusion is, that the judgment should be reversed and a new trial granted, costs to abide event."

GRAY, J. (dissenting). " A majority of my brethren have voted to reverse the judgment upon the verdict for the plaintiff, which the learned trial judge directed, and which the General Term below have affirmed, because they think the jury should have been allowed to pass upon the issues. As the case was developed, the proof was such as to form a possible issue but upon one question of importance, and that was not material, in view of what had already been established by the evidence. That question, to which much prominence has been given, is whether Stokes agreed in March, 1889, to waive and to abandon any rights, which he had acquired under the contract of December, 1888. I think that it is impossible, upon a careful consideration of this evidence, justly, to hold that any such question was open to opposing inferences.

" To have sent the case to the jury, would have been, in effect, to authorize them to speculate and surmise with respect to questions, which either were not material, or were, from the nature of the proofs, susceptible of but one answer. The evidence conclusively shows when, in December, 1888, the negotiations for a delivery by Stokes of the telegraph properties resulted in the execution of a contract between him and De Castro, not only that Stokes held the legal title to and had the possession of all of them, and that they were the fruits of the efforts of Stokes, through the purchase of the Bankers and Merchants' Telegraph

Company's property and franchises and in their re-organization and development, in the new United Lines Company, under his control and presidency; but that he was a co-adventurer or partner with Mackay in the scheme to build them up and, eventually, to consolidate them with Mackay's Postal Telegraph line; with an interest in these new properties, which his labor of years had created, which was to be recognized in a participation in the profits or stock of the new corporation to be formed by consolidation. In this attitude of being the legal owner of the properties and entitled by promise, as by his conceded deserts, to some share or interest, Mackay undertook to obtain from him the bonds and shares of the telegraph companies, through the agency of Platt and De Castro, the latter of whom for years had represented him in his various relations with Stokes, and was, with respect to obtaining these securities, particularly instructed and authorized by Mackay. This contract for a sale of the telegraph properties is drawn up, which is signed by Stokes and by De Castro, and which is forwarded to Mackay for his signature. At the time of its execution Stokes refuses to hand over any securities to De Castro, but is willing that Ingersoll shall hold them, and, meanwhile, and until Mackay can be heard from, turns over $935,000 of bonds in part performance. Mackay is advised in the telegram from De Castro, on December 24th, of the deposit of the bonds, and that an agreement has been forwarded for his signature, which left Stokes out of the telegraph business. He was advised on the same day, in the telegram from Platt, that $1,600,000 of United Lines Company's stock — a controlling interest — would be assigned, if the agreement forwarded was signed. Thus Mackay was informed of a consummation of his agent's negotiations in an agreement which provided for his getting the properties and which left Stokes out of the telegraph business; that a large number of bonds had been deposited with Ingersoll, and that a controlling interest in the stock would be assigned when he approved of the agreement. He might have waited to read the contract, but he promptly telegraphs back to De Castro, 'All right and satisfactory;' and to Platt, 'All right,' and.

for him to take whatever securities Ingersoll gave him. De Castro gave Stokes a copy of Mackay's telegram on December 26th, and, on the strength of Mackay's distinctly expressed approval, Stokes delivers up the $1,600,000 of stock that day, as Ingersoll's letter to Mackay, written in the afternoon, shows. Also, on that day, De Castro acknowledges upon the contract of the 24th the receipt of the securities; evidencing ready performance by Stokes, on his part, of the contract, in giving over the securities and surrendering his control of the United Lines Company. When Mackay acknowledged the receipt of the contract, so far from expressing himself in repudiation and rejection of it, as it was his honest duty to do, if he did not propose to have anything to do with it, he simply takes exception to portions of it. He, in affirmative words, directs a retention of the securities, obtained through his agent's transactions, when he writes to Ingersoll: 'There is no necessity to make any change at present, except to place the securities with Platt for safe keeping.' At that time, and from the time of the negotiations, Ingersoll had ceased to be Stokes' lawyer. He himself says: 'When they fell out I stepped out.' Occupying, therefore, in the commencement, ostensibly, a neutral position as depositary, the effect of Mackay's letter of January 3rd was to make Ingersoll his custodian of the securities. It was utterly and clearly inconsistent with a rejection by Mackay of the contract that he should request no change to be made, and that a delivery of the securities should be made by Ingersoll to his financial agent, Platt. Mackay knew, of course, that those securities were in Stokes' legal ownership and possession, and that something in the nature of a sale or transfer was necessary to get them over into his own possession. Both he and his agent De Castro knew that Stokes had an interest at stake in the telegraph properties. Hence, Mackay was bound to know, when he was informed of an agreement being made and of securities in part deposited with Ingersoll under it, and others to be deposited, if he was heard from in approval, that Stokes' interests had been acquired on the basis of some consideration moving to him. Any other assumption would be

foolish. It was open to him to defer expressing himself, but he elected to confirm his trusted agent's transaction, and thus, to obtain at once a delivery of the shares of stock, which carried the control of the United Lines Company, and in that he certainly succeeded. When, upon receipt of the contract, he saw that it effected a sale to him of the telegraph properties, that did not surprise him, and very naturally so considering Stokes' title, and his letter emphatically evidences his intention to hold on to the properties which Stokes had delivered. The sole question for Mackay on January 3rd, when he received the contract, was one of its adoption, or of its rejection. His duty was plain and honest. The law rigidly held him to the duty of making known at once his answer, with the text before him. He did not even hesitate then; any more than when he telegraphed, in reply to the telegrams of December 24th, that it was all right and satisfactory, and thus secured possession of the $1,600,000 of stock upon strength of its distinct approval of De Castro's act. By letters, as by telegrams, he was earnest in his desire to keep hold, through Ingersoll, of what Stokes had delivered, and to have them safely placed in the keeping of his financial agent, Platt.

"I do not see how it can seriously be pretended, either, that from the moment Mackay wrote to Ingersoll on January 3rd, Ingersoll could have understood anything else than that Mackay proposed to hold on to the securities, and that he had not decided to reject the contract. Ingersoll would not have dared, after that letter to him, to give back the securities to Stokes. He was a good enough lawyer to know that, thenceforth, Mackay considered that he was holding them for him, and that his position was directly affected by the notice in Mackay's letter. What was the result? On March 20th, 1889, when Ingersoll turned over to Platt the securities he had received from Stokes, the receipts given show that, between the time when the contract was signed and the $935,000 of bonds were delivered, Stokes, assured by Mackay's prompt and emphatic telegraphic reply that he was satisfied with De Castro's transaction, commenced, with the delivery of the 16,000 shares of stock, a faithful performance on his part of

the agreement, and subsequently turned over 7,380 more shares of the United Lines Co.'s stock, besides other bonds and shares. There was on Mackay's part, with full knowledge of the facts, as complete an adoption of the contract his agent had undertaken to make, as the law. could ever require. Admitting that it was open to Mackay, when advised of the agreement, to refuse to be bound by it, by his failure to make known his refusal, and by his retention and ultimate acceptance of the benefits of his agent's transaction, he, in legal effect, adopted it as his own. To say that there was a question for the jury to decide, arising out of the conflicting testimony of Stokes and Ingersoll, after Mackay came on to New York in March, as to whether Stokes did not agree to abandon the contract and to trust to Mackay's generosity for his compensation, is, as a proposition for consideration, too great a tax upon human credulity; while, as a legal proposition, it is untenable, in view of the acts of the parties. Mackay, by his acts, had become bound to abide by the contract. It was incumbent upon him, in the first place, if he would not be bound by the contract of his agent's making, to say so in unequivocal terms; and afterwards, if he was going to repudiate his obligations, at any rate, to place Stokes back in his former position by returning all that he had delivered. This he did not do, and, therefore, the law does not allow him now to say, "I did not come into this contract," when Stokes, relying upon his acts, had honestly performed his part of the agreement. It is a most extraordinary kind of an abandonment of a contract for one party to set up, when sued by the other to perform his obligation under it; having practically received all the property called for by the contract, and the other party standing denuded through performance.

"In view of the knowledge we have from the evidence, as to Stokes' original position and of the concession as to the preponderance of the evidence in favor of his right to compensation, and in further view of what was done under the contract, I think it is a very technical and a very unwarrantable conclusion to hold that it should have been left to a jury to determine, whether or not there was in March an agreement by

Stokes to abandon the contract and to rely on Mackay's generosity for compensation.

"I think we should affirm this judgment."

*Joseph Larocque* for appellants.

*Esek Cowen* and *Joseph H. Choate* for respondent.

EARL, J., reads for reversal; ANDREWS, Ch. J., FINCH and O'BRIEN, JJ., concur.

GRAY, J., reads for affirmance; PECKHAM and MAYNARD, JJ., concur.

Judgment reversed. _____